—— A.2d ——

J. Michael STOUFFER, Commissioner of Correction

v.

Troy REID.

No. 243, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Feb. 6, 2009.

270

Laura Mullally (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for Appellant.

Stuart O. Simms (Brown, Goldstein & Levy on the brief), Baltimore, for Appellee.

Panel: DAVIS, ZARNOCH, TONI E. CLARKE, (specially assigned), JJ.

DAVIS, Judge.

J. Michael Stouffer, appellant, Commissioner of Correction, filed a Complaint for Declaratory Judgment and Application for Temporary Restraining Order and Preliminary and Permanent Injunction in the Circuit Court for Baltimore City against Troy Reid, appellee, an inmate in appellant's custody. Appellant sought to compel appellee, over appellee's objection, to submit to kidney dialysis and medical treatment. A hearing was held on May 1, 2008 before the circuit court (Nance, J.). At the close of the hearing, the circuit court orally denied appellant's complaint and, on May 6, 2008, filed a Declaratory Judgment, adjudging that appellee could refuse dialysis and medical treatment. Appellant appeals the circuit court's ruling and presents one question for our review, which we have rephrased as follows:

Did the circuit court err in determining that appellant was without legal authority to compel appellee to submit to medical treatment?

For the reasons that follow, we answer appellant's question in the negative. Accordingly, we affirm the judgment of the circuit court.

## FACTUAL BACKGROUND

In 1995, appellee was sentenced to a forty-year term of imprisonment. In July 2007, prison medical personnel diagnosed appellee with end-stage renal disease. Thereafter, appellee was prescribed kidney dialysis three times per week. Appellee objected to receiving dialysis and periodically refused to accept dialysis, sometimes going weeks at a time without receiving treatment. In early April 2008, appellee again refused dialysis and, on April 11, 2008, appellant filed a Complaint for Declaratory Judgment and Application for

Temporary Restraining Order and Preliminary and Permanent Injunction in the Circuit Court for Baltimore City, seeking to compel appellee to submit to dialysis and medical treatment.[1] The circuit court granted appellee a temporary restraining order (TRO) on April 25, 2008, ordering appellee to submit to dialysis and medical treatment.

At a hearing held on May 1, 2008, the trial judge, in an oral ruling from the bench, denied appellant's request for a permanent injunction and declared that appellee had the right to refuse kidney dialysis and other medical treatment:

[Appellant] is the head of the Department of Correction. He ... [has] the responsibility of maintaining the operation of the correctional institutions in the State of Maryland.... [Appellee] is an inmate within the Department of Correction ... [and is] a charge of [appellant]. [Appellant] has the responsibility of insuring [safety] ... and provid[ing] proper medical treatment and care for ... inmates.

\* \* \*

The testimony submitted by [appellant] ... is that failure to abide by that medical treatment ... would negatively impact this inmate. It would impact his heart, his heartbeat, the regularity of his heartbeat, that may cause a heart attack; is that it would cause fluid to build up in the body that is not being taken out of the body under normal means and that fluid may build up in his leg, in his face, in his lungs, and in his lungs could cause respiratory failure and that respiratory failure could lead to heart attack or death.

\* \* \*

[T]he inmate also has high blood pressure and that failure to receive the treatment in question may impact negatively to his high blood pressure. The impact could lead to the

---

1. In addition to end-stage renal failure, appellee suffers from human immunodeficiency virus (HIV), high blood pressure and anemia.

heightening of his high blood pressure, that also could lead to stroke.

\* \* \*

Maryland is clear that a mentally competent adult may refuse medical care, even though the refusal may result in his or her death, and that unless there are compelling State interests which override the person's interest in their body's integrity, as the *Mack*[2] case says, is that the Court should recognize it.

In this case ... [what appellant] is saying, [appellee], is that he recognizes that you are a competent individual and he recognizes that you have not been a troubling impact overall while in this facility. That is clearly what is being said here is that you have not disrupted the system; is that it is, in fact, raising the question of concern (a) for your health and trying to make sure that you receive the medical treatment that he and the medical providers say are necessary.... [I]t's been determined by the doctors that you need this treatment.

\* \* \*

[M]y concern is as to whether or not the countervailing State interest in this case, as identified by the Court of Appeals, does apply. One of the countervailing factors is preserving your life.

The other is around the safety and the safety of others and whether or not it's there. Well, I'm not hearing that you're doing this to cause [something to happen] and ... that it will simply pass.... The Court's question of [appellee] is is he trying to kill himself and he said, no, that's not the case, and so prevention of suicide is not it.

The maintenance of ethical integrity of the medical profession or the medical treatment is the last point of the

---

2. *Mack v. Mack,* 329 Md. 188, 618 A.2d 744 (1993) articulates four countervailing State interests, which we shall discuss, *infra.*

balancing ... [and] the medical profession has made it clear is that they believe this is needed.

\* \* \*

I don't like playing Russian roulette with anyone's life.... However, on this date, the Court is satisfied that the inmate is aware that he has been advised that the medical treatment that's being offered to him is appropriate and necessary, and that refusal to receive that medical treatment may be harmful to him.

\* \* \*

This Court believes that [appellee] is competent, but ill-informed in his own wisdom. However, the Court denies the request at this time. The motion for permanent injunction is denied.

In a written order issued on May 2, 2008, the trial court denied appellant's request for a permanent injunction and issued a declaratory judgment on May 6, 2008, memorializing the May 1, 2008 oral ruling. The trial court based its declaratory judgment that "the state interests in forcing [appellee] to undergo dialysis does not outweigh [appellee's] right to refuse medical care" on the following:

(1) [Appellee] has been diagnosed with, among other medical conditions, end-stage kidney disease, for which he should receive dialysis three times a week. [Appellee] has refused this treatment.

(2) There has been no argument or suggestion that [appellee] is not a competent adult.

(3) [Appellant], in his responsibility to oversee and maintain the proper medical care of prisoners, has petitioned this court requesting permanent injunctive relief.

(4) Citing *Mack v. Mack, supra,* the court concluded that a patient has a right to refuse treatment, but this right is not absolute. This right must be balanced against the state interests of the preservation of life, protection of innocent

third parties interests, suicide prevention, and the maintenance of the ethical integrity of the medical profession. (5) [Appellee] is not contemplating suicide, nor is there evidence that his refusal has caused any disruption in the operation of the prison system, nor is there any indication that he seeks to cause a disturbance.

(6) [Appellant] showed proper concern for the negative impact [appellee's] choice could have upon the prison community, but there has been no evidence presented that [appellee] has made any attempt to disrupt the order of the prison, nor is there any evidence suggesting the actions of [appellee] would cause disruption to the prison community, and no evidence has been presented showing that [appellee's] choice has harmed the integrity of the medical profession.

Appellant timely filed this appeal.

On May 5, 2008, appellant filed an Emergency Motion for Injunctive Relief Pending Appeal, requesting a stay of his April 25, 2008 TRO. On May 6, 2008, we stayed enforcement of the circuit court's order pending the filing and consideration of appellee's response to appellant's motion. Appellee filed a Show Cause Order on July 7, 2008. On July 31, 2008, we denied appellant's May 5 then emergency motion, but ordered that the stay remain in effect until August 15, 2008. On August 14, 2008, the Court of Appeals denied appellant's petition for writ of *certiorari* and motion for injunction pending appeal.

Additional facts will be discussed as warranted, *infra.*

## LEGAL ANALYSIS

### I

Appellant contends that the circuit court erred in determining that he could not compel appellee to submit to kidney dialysis and medical treatment. We disagree.

Our review of the issue raised in this appeal is pursuant to Md. Rule 8–131(c):

(c) Action tried without a jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

"The clearly erroneous standard does not apply to the circuit court's legal conclusions, however, to which we accord no deference and which we review to determine whether they are legally correct." *Cattail Assocs. v. Sass,* 170 Md.App. 474, 486, 907 A.2d 828 (2006). We will "review the trial court's application of the law to the facts on an abuse of discretion standard." *Porter v. Schaffer,* 126 Md.App. 237, 259, 728 A.2d 755 (1999).

## A.

## STATE INTERESTS

The circuit court based its determinations on *Mack, supra,* 329 Md. 188, 618 A.2d 744, which addresses the qualified common law right of a competent adult to refuse medical care. Following the reasoning of the Court of Appeals in *Mack,* we will "sketch the path of general reasoning from the basic right to the particular application" sought here by the parties. *Id.* at 210, 618 A.2d 744. The "doctrine of informed consent[,] as part of the common law, . . . 'follows logically from the universally recognized rule that a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient.'" *Id.* (quoting *Sard v. Hardy,* 281 Md. 432, 438–39, 379 A.2d 1014 (1977)). " 'The fountainhead of the doctrine . . . is the patient's right to exercise control over his own body, . . . by deciding for himself whether or not to submit to the particular therapy.'" *Id.* (quoting *Sard,* 281 Md. at 439, 379 A.2d 1014). "A corollary to the doctrine is the patient's right, *in general,* to refuse treatment and to withdraw consent to treatment once begun." *Id.* (Emphasis added).

■ The right to refuse treatment is not absolute; rather, it is subject to "at least four countervailing State interests: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession." *Id.* at 210, n. 7, 618 A.2d 744 (quoting *Brophy v. New England Sinai Hosp., Inc.,* 497 N.E.2d 626, 634 (Mass.1986)). In *Mack,* the Court of Appeals went on to add:

> Some courts have held that a person's right to refuse treatment is based on a federal or state constitutional right of privacy. *See, e.g., Rasmussen v. Fleming,* 154 Ariz. 207, 741 P.2d 674, 682 (1987) (federal and state); *Bouvia v. Superior Court,* 179 Cal.App.3d 1127, 225 Cal.Rptr. 297, 301 (1986) (federal and state); *In re Severns,* 425 A.2d 156, 158 (Del.Ch.1980) (federal); *In re A.C.,* 573 A.2d 1235, 1244–47 (D.C.1990) (federal); *In re Guardianship of Browning,* 543 So.2d 258, 267 (Fla.Dist.Ct.App.1989) (state), *aff'd,* 568 So.2d 4 (Fla.1990); *Brophy,* 497 N.E.2d at 633 (federal); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417, 424 (1977) (federal). Although the United States Supreme Court's decision in *Cruzan [v. Director, Missouri Dep't of Health],* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 [ (1990) ], made no holding on the subject, all of the justices, save Justice Scalia, either flatly stated or strongly implied that a liberty interest under the Fourteenth Amendment gives rise to a constitutionally protected right to refuse life saving hydration and nutrition. *See id.* at 278, 110 S.Ct. at 2851, 111 L.Ed.2d at 241–42; *id.* at 287, 110 S.Ct. at 2856, 111 L.Ed.2d at 247–48 (O'Connor, J., concurring); *id.* at 304–05, 110 S.Ct. at 2865, 111 L.Ed.2d at 257 (Brennan, Marshall, and Blackmun, JJ., dissenting); *id.* at 331, 110 S.Ct. at 2879, 111 L.Ed.2d at 275 (Stevens, J., dissenting).

*Id.* at 210–11, 618 A.2d 744 (internal citations omitted).

As in the case *sub judice,* in *Mack,*

> there is no issue that turns on whether the right to refuse treatment is a constitutional or common-law right. It is sufficient for present purposes to decide this case under the

Maryland common-law right of a competent adult to refuse treatment. For cases in which the court found no need to opine beyond a common-law analysis, *see Barber v. Superior Court,* 147 Cal.App.3d 1006, 195 Cal.Rptr. 484 (1983); *In re Estate of Longeway,* 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 (1989); *In re Gardner,* 534 A.2d 947 (Me.1987); *In re Peter,* 108 N.J. 365, 529 A.2d 419 (1987); *In re Conroy,* 98 N.J. 321, 486 A.2d 1209 (1985); *In re Storar,* 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, *cert. denied sub nom. Storar v. Storar,* 454 U.S. 858, 102 S.Ct. 309, 70 L.Ed.2d 153 (1981); *In re Delio,* 129 A.D.2d 1, 516 N.Y.S.2d 677 (1987).

*Id.* at 211, 618 A.2d 744.

The principal pillar upon which appellant seeks to distinguish *Mack* is his claim that the Court of Appeals did not address the unique circumstances involved when the right to refuse medical treatment is being asserted by a prison inmate. Specifically, the circuit court failed to take into account the repercussions that arise in a prison environment when an inmate refuses medical treatment, particularly when that treatment is necessary to protect the inmate from serious bodily injury or death. The circuit court, appellant contends, failed to acknowledge the effect that appellee's refusal to accept medical treatment has on the prison staff and inmate population. Appellant contends that, contrary to the circuit court's findings, his position is supported by at least three of the four factors delineated in *Mack:* "preservation of life," the "protection of interests of innocent third parties" and the "maintenance of the ethical integrity of the medical profession." *Id.* at 210, n. 7, 618 A.2d 744.[3]

### i.

### Preservation of Life

Regarding the "preservation of life," Dr. Tadesse Telda, a physician employed by the State's prison medical contractor,

---

**3.** Appellant does not contend that appellee is attempting to commit suicide. *Id.* at 210, n. 7, 618 A.2d 744.

testified that, if appellee did not receive medical treatment and dialysis for his end-stage renal disease and related illnesses, appellee would suffer serious bodily injury or death. Appellant posits that appellee erroneously believes that he does not require dialysis or medical treatment and that he has been falsely diagnosed by his care providers. Appellee's belief is expressed in the following colloquy:

[APPELLEE]: Like I was saying, I don't want to take dialysis. You know, they say after a few weeks of not taking it, I'll go through all of these complications, but I haven't been going through no complications, you know. I mean, I have refused dialysis before for like months. The professionals, the doctors said I should have been dead, but I wasn't. So, I mean, my whole thing is that—

THE COURT: Well, why do you think that that didn't happen, that you didn't die?

[APPELLEE]: Because, obviously, they were wrong. You know, I think—

THE COURT: You mean because in the past you didn't die, they were wrong?

[APPELLEE]: I think they were wrong because, for one, all of the complications that I'm supposed to go through, I don't go through. I mean, I think I was falsely diagnosed.

THE COURT: You think you were falsely diagnosed?

[APPELLEE]: Yes.

THE COURT: You don't think you have kidney disease?

[APPELLEE]: Yes, I don't think I have kidney disease.

That appellee suffered from kidney disease was established beyond any doubt at the hearing and the trial judge expressly acknowledged that appellee's failure to accept medical treatment was potentially life-threatening. In light of the severity of appellee's condition and his erroneous belief that he was falsely diagnosed, appellant asserts that the "preservation of life" factor supports the State's interest in compelling appellee to undergo kidney dialysis and other related medical treatment.

Appellee posits that, under Maryland's Health Care Decisions Act, an individual who executes an advance directive regarding the withholding or withdrawal of health care has a statutory right to refuse medical care. Md.Code, Health–General (H.G.), § 5–602 (2005 Repl. Vol, 2008 Supp.).[4] *See also Mack*, 329 Md. at 210–11, 618 A.2d 744. This right overlies the common law right to refuse medical treatment and to withdraw consent to such treatment once begun. *Mack*, 329 Md. at 210, 618 A.2d 744. A written advance directive is valid if signed by the declarant and subscribed by two witnesses. H.G. § 5–602(c)(1). An advance directive becomes effective when conditions specified in the directive are satisfied. H.G. § 5–602(e)(1).

On May 6, 2008, appellee executed a written advance directive stating his desire to refuse dialysis. The directive was signed by appellee, his attending physician and two witnesses. In his directive, appellee acknowledged that cessation of dialysis will result in his death and he took full responsibility for the consequences of his refusal of treatment. The Maryland Attorney General has stated that individuals may use advance directives "to decide against the use of life-sustaining procedures under three circumstances: 'terminal condition,' 'persistent vegetative state' or *'end-stage condition.'*" 78 Md. Op. Att'y Gen. 208, 211 (June 1, 1993) (citation omitted) (emphasis added). Furthermore, the Maryland Attorney General has identified dialysis as an example of a life-sustaining procedure that may be declined. 79 Md. Op. Att'y Gen. 218 (May 3, 1994).

Appellee's argument is flawed in that, although he suffers from an "end-stage" disease, his current condition does not effectuate his advance medical directive. H.G. § 5–601(j) defines an "End-stage condition" as

an advanced, progressive, irreversible condition caused by injury, disease or illness:

---

4. Any reference to "H.G." refers to Md.Code, Health–General, (2005 Repl. Vol., 2008 Supp.).

(1) That has caused severe and permanent deterioration indicated by incompetency and complete physical dependence; and

(2) For which, to a reasonable degree of medical certainty, treatment of the irreversible condition would be medically ineffective.

The Maryland Attorney General has indicated that "end-stage condition" applies to individuals who have suffered severe and permanent generalized infirmity from an untreatable irreversible condition. 78 Md. Op. Att'y Gen. at 212–13. Although "a patient in end-stage condition does not suffer a total loss of consciousness, . . . the condition must have caused 'severe and permanent deterioration.'" *Id.* Furthermore, the "hallmarks of this deterioration . . . refers to the patient's inability to understand or evaluate treatment issues." *Id.* Appellee is a competent adult for whom medical treatment is effective. Furthermore, the evidence does not indicate that appellee suffers from a "permanent generalized infirmity" or that he cannot understand or evaluate treatment issues. Appellee's filing of an advanced medical directive, therefore, is ineffectual.[5]

Notwithstanding his deficient advance medical directive, appellee contends that, when a competent adult refuses medical treatment, "the State's interest in preserving the particular patient's life will not override the individual's decision." *Norwood Hosp. v. Munoz*, 409 Mass. 116, 564 N.E.2d 1017, 1023 (1991). Even in cases where a patient's condition is curable, the State's interest in preserving life is diminished "because the life that the [S]tate is seeking to protect in such a situation is the life of the same person who has competently decided to forgo the medical intervention." *Id.* (internal citation omitted). *See also In re Guardianship of Grant*, 109 Wash.2d 545, 747 P.2d 445, 451 (1987) (State's interest in the preservation of life of inmate suffering from terminal illness can diminish in

---

5. Notably, appellee has also failed to appoint "an agent to make health care decisions for the individual under the circumstances stated in the advance directive." H.G. § 5–602(b)(2).

cases where treatment is invasive and postpones death). The State's duty to preserve life must also "encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity." *Brophy*, 497 N.E.2d at 635.

◼ The circuit court found that appellee is a competent adult who, notwithstanding being "ill-informed in his own wisdom," had expressly stated his desire to forego medical treatment that he finds objectionable. Although appellant advances a legitimate concern relating to the "preservation of life" factor, such an interest is not sufficient to overcome a competent adult's choice to refuse medical treatment. Notably, appellee's skepticism about his condition arises from the information that was provided to him from medical professionals that turned out to be inaccurate; namely, that he would immediately suffer severe symptoms if he discontinued dialysis, which subsequently did not happen when appellee ceased dialysis for weeks at a time. We note the same concerns as the circuit court regarding appellee's understanding as to the seriousness of his condition, but such concerns are insufficient for us to divest a competent adult of his right to refuse medical treatment.

## ii.

### Interests of Third Parties

The second *Mack* factor relates to the protection of the interests of innocent third parties from the potential harm caused by appellee's death. According to appellant, the Department of Corrections (DOC) confines 23,000 prison inmates and employs 6,500 individuals. Appellant asserts that inmates and employees bear the brunt of disruptions to the safety and security of the State's prisons and that appellee's refusal to accept medical treatment will result in such a disruption. Consequently, appellant posits that the safety and "protection of the interests of innocent third parties" under *Mack*—here

the State's inmates and employees—support compelling appellee to accept medical treatment.

Appellant fails to provide any authority that would support an application of the "interests of innocent third parties" factor to the present circumstance. In determining whether a state has a compelling interest in protecting innocent third parties, a court typically considers "the interests of the patient's dependents and family members." *McNabb v. Dep't of Corr.*, 163 Wash.2d 393, 180 P.3d 1257, 1266 (2008). "Generally, this concern [about protecting innocent third parties] arises when the refusal of medical treatment endangers public health or implicates the emotional or financial welfare of the patient's minor children." *Thor v. Superior Court*, 5 Cal.4th 725, 21 Cal.Rptr.2d 357, 855 P.2d 375, 387 (1993). *See also Polk County Sheriff v. Iowa Dist. Court for Polk County*, 594 N.W.2d 421, 428 (Iowa 1999); *McKay v. Bergstedt*, 106 Nev. 808, 801 P.2d 617, 627 (1990).

There is nothing in appellee's condition that endangers or affects the public health, nor does appellee have any children or dependents that would be affected by any choice appellee makes concerning his health. Consequently, the "interests of innocent third parties" factor is inapposite to appellant's argument that appellee does not have the right to refuse dialysis and related medical treatment.

### iii.

### Integrity of Medical Profession

The next *Mack* factor addresses the impact of appellee's refusal on the maintenance of the ethical integrity of the medical profession. The circuit court's May 6, 2006 order stated that "no evidence has been presented showing that [appellant's] choice has harmed the integrity of the medical profession." Appellant asserts that this determination contradicted its May 1, 2008 oral ruling, in which the trial court found that (1) the medical profession believes that appellee's treatment is medically necessary, (2) appellee's physicians have attempted to treat appellee and (3) the physicians' advice

and efforts have been rejected by appellee. Appellant argues that such findings clearly demonstrate harm to the integrity of the medical profession and support compelling appellee to accept medical treatment.

Appellant's argument fails to cite to any authority.[6] Stated otherwise, appellant contends that the ethical integrity of the medical profession has been harmed because appellee is refusing medical treatment that medical professionals have determined is necessary and have attempted to provide. We fail to see how the medical profession has been harmed by this. As discussed *supra*, the circuit court found that appellee is a competent adult who has expressly stated his desire to forego medical treatment he finds objectionable. Appellant has neglected to illuminate any ethical dilemma on which to base his argument. Medical professionals continue to provide a diagnoses and continue to attempt to treat patients with no question as to their ethics or integrity. Furthermore, in light of the well-defined right of an individual to refuse medical treatment, discussed *supra*, and having been provided no authority by appellant to indicate otherwise, we hold that the ethical integrity of the medical profession is not harmed by allowing appellee, a competent adult, to refuse medical treatment.

### iv.

### Safety and Security of Prisons

Appellant finally contends that the *Mack* factors are not exclusive, *Mack*, 329 Md. at 210, n. 7, 618 A.2d 744, and that the State's obligation to maintain the safety, security and good order of its prisons is an additional consideration in assessing whether an inmate can be compelled to accept medical treatment. Appellant posits that appellee's refusal to accept medical treatment threatens the safety and security of the inmates

---

6. Health care providers are not subject to criminal or civil liability and not deemed to have engaged in unprofessional conduct as a result of withdrawing health care pursuant to an advance health care directive. H.G. § 5–609.

and employees in the DOC. Randy Watson, Assistant DOC Commissioner, submitted an affidavit regarding the repercussions and effects of appellee's refusal to accept medical treatment:

I believe that [appellant] *faces immediate, substantial, and irreparable harm* from [appellee's] continued refusal to receive medical care, for the reasons set out below.

[Appellee's] refusal to submit to kidney dialysis *has required and continues to require a substantial and disproportionate utilization of limited case management, medical and psychological resources* for the care of inmates at . . . a time when all major institutions in the DOC are overcrowded and are faced with limited resources to deal with the needs of the inmate population. As [appellee's] health deteriorates further, the demands on limited institutional resources caused by his conduct will increase, diverting them from other institutional missions.

By placing continuing extraordinary demands on case management, medical and psychological personnel while his condition deteriorates to the point where *he may die or his body may be permanently damaged,* [appellee's] refusal to accept kidney dialysis is *damaging, and will continue to damage, the morale of staff.*

It is inevitable that [appellee's] refusal to accept dialysis will become increasingly known to the other inmates . . . throughout the DOC if prompt medical intervention is not authorized, and it will *affect the morale of the inmate population* in ways which I believe will adversely affect the operation of the DOC's institutions.

(Emphasis added).

By way of illustration, the failure to effectuate medical intervention, according to Watson, will cause the perception among some inmates that the administration is not in control of the inmate population, and that the allocation of the limited resources of the DOC may be manipulated by an inmate's unilateral decision to refuse medical care. The result in a correctional environment would be the lessening of the respect

the inmate population has for staff, leading to instances of inmate refusal to comply with institutional rules and staff direction. Finally, other inmates might perceive the DOC's inability to stop appellee from injuring or killing himself as a failure to act in an appropriate, humanitarian manner and might similarly lessen inmate respect for staff, leading to inmate resistance to staff direction and control.

More specifically, for example, it will *cause the perception among some inmates that the administration is not in control of the inmate population,* and that the *allocation of the limited resources of the DOC may be manipulated by an inmate's unilateral decision to refuse medical care.* In a correctional environment this will lessen the respect the inmate population has for staff, and will lead to instances of inmate refusal to comply with institutional rules and staff direction. For other inmates, the DOC's inability to stop [appellee] from injuring or killing himself will be perceived as a failure to act in an appropriate, humanitarian manner, and will similarly lessen inmate respect for staff, leading to inmate resistance to staff direction and control.

(Emphasis added).

At the May 1, 2008 hearing, appellant testified that inmates may react, violently or peaceably, to another inmate's death if the inmates believe that the deceased inmate did not receive proper medical care and that, because inmates regularly communicate with one another, the response to an inmate's death may not be limited to a particular institution. Appellant further testified that he expends significant resources to investigate an inmate's death and to assure other inmates that the death was not preventable, but such outreach to the inmate population is limited to oral communication and may be hampered by privacy considerations.

■ "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). "[T]he State has a legitimate interest in maintaining strict discipline and effective

security within [the prison] system." *Epps v. State,* 333 Md. 121, 127, 634 A.2d 20 (1993); *see also Robinson v. State,* 116 Md.App. 1, 9, 695 A.2d 198 (1997) ("Prison is a place where 'good order and discipline are paramount because of the concentration of convicted criminals.' ") (quoting *United States v. Newby,* 11 F.3d 1143, 1145 (3rd Cir.1993), *cert. denied,* 513 U.S. 834, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994)). Thus, "[t]he adoption and execution of prison policies are 'peculiarly within the province and professional expertise of corrections officials' whose judgment should generally be deferred to by the courts." *Robinson,* 116 Md.App. at 9, 695 A.2d 198 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

Appellant posits that the United States Supreme Court and Maryland courts have repeatedly recognized a state's interest in preserving the security and good order of its prisons. *See Washington v. Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) ("The legitimacy, and the necessity, of considering the State's interests in prison safety and security are well established by our cases."); *Jones v. N.C. Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) ("The interest in preserving order and authority in the prisons is self-evident. Prison life, and the relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration.") (citing *Wolff v. McDonnell,* 418 U.S. 539, 561–62, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)); *Turner v. Safley,* 482 U.S. 78, 91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (affirming prohibition against correspondence between inmates at different penal institutions).

Courts should consider "the impact ... [that an] asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. Furthermore, in a "correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's

limited resources for preserving institutional order. When accommodation of an asserted right will have a significant *'ripple effect'* on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (Emphasis added). *See also Harper,* 494 U.S. at 225, 110 S.Ct. 1028.

 The standard governing restrictions on a prisoner's rights is one of reasonableness. Prison officials may "anticipate security problems and [ ] adopt innovative solutions to the intractable problems of prison administration." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. Although appellant only briefly cites to *Turner,* appellee, in his brief, argues at length that *Turner* supports his right to refuse medical treatment under the present circumstances. Specifically, appellee argues that the various factors and analysis set forth in *Turner* indicate that appellant has no legitimate penological interest in compelling appellee to accept medical treatment. *Turner* "acknowledged that while inmates retain their fundamental constitutional rights, difficulties inherent in prison administration diminish an inmate's rights." *McNabb,* 180 P.3d at 1264 (citing *Turner,* 482 U.S. at 84–85, 107 S.Ct. 2254). *Turner,* however, addressed the constitutionality of a prison *regulation* by determining whether the regulation was reasonable on its face. *Id.* The present case does not involve a facial challenge to a prison policy or regulation; rather, we are cogitating the constitutionality of a prison policy as applied to appellee. *Turner* does not assist us in "balancing the competing interests" of appellant and appellee; however, it delineates the "State's ... compelling interest in maintaining security and orderly administration in its prison system" and the "due deference [given to prison officials] regarding the manner in which the officials ... provide medical services to incarcerated individuals." *Id.* at 1265. Notwithstanding this consideration, we are not reviewing any specific regulation for which we can apply *Turner.* Rather, our focus is very narrow and limited to this individual and specific circumstance. Consequently, we decline to further address the parties' contentions as they relate to *Turner.*

Appellant contends that he sought to address security problems by seeking medical treatment for appellant, which serves a legitimate penological goal because such care will prevent appellee from suffering death or serious medical harm and avert the alleged threat of harm and "ripple effect" posed by other inmates arising from appellee's refusal to submit to treatment. Additionally, if appellee were to continue dialysis, appellant would no longer be required to expend a disproportionate level of care and attention that appellee needs when not on dialysis, which is critical during a time when prison resources are limited by the size of the prison population.

Appellant asserts that, although the circuit court acknowledged that appellant "showed proper concern for the negative impact [appellee's] choice could have on the prison community," it prevented appellant from acting to protect the safety and security of the DOC's inmates and employees. Contrary to the circuit court's ruling, appellant argues that the weight of out-of-state authority supports the State's right to intervene and preserve an inmate's life, even though he is mentally competent and refuses medical care. *See Comm'r of Corr. v. Myers*, 379 Mass. 255, 399 N.E.2d 452, 458 (1979) (affirming a state's right to administer hemodialysis and medication to a prisoner because a state's interest in orderly prison administration outweighed an inmate's interests in refusing medical care); *Commonwealth v. Kallinger*, 134 Pa.Cmwlth. 415, 580 A.2d 887, 893 (1990) (upholding forcible feeding of hunger-striking prisoner, because a state's interests in prison security and discipline, prevention of suicide and integrity of medical profession, outweighed inmate's individual freedoms); *In Re Caulk*, 125 N.H. 226, 480 A.2d 93, 97 (1984) (a state's interest in preserving life and maintaining institutional order outweighed inmate's interest in self-starvation and permitted administration of nutrition over the inmate's objection); *McNabb*, 180 P.3d at 1265 (State's interests in applying Department of Corrections' force-feeding policy to inmate outweighed inmate's right to refuse artificial means of nutrition and hydration); *State ex rel. Schuetzle v. Vogel*, 537 N.W.2d 358, 364 (N.D.1995) (requiring that inmate take diabetes medi-

cation against his will was reasonably related to legitimate penological interests; thus, prison officials could forcibly administer food, insulin and other medications to the prisoner to preserve his health and life); and *State ex rel. White v. Narick*, 170 W.Va. 195, 292 S.E.2d 54, 58 (1982) ("West Virginia's interest in preserving life is superior to [the hunger-striking inmate's] personal privacy (severely modified by his incarceration) and freedom of expression right.").

Notwithstanding the State's obligation to maintain the safety, security and good order in its prisons, the cases upon which appellant relies demonstrate that the State does not have a legitimate penological interest in forcing appellee to submit to dialysis. We explain.

■ The cases cited by appellant are distinguishable from the case *sub judice* in that they either involved a direct threat from an inmate or involved inmates protesting prison policies or otherwise attempting to manipulate corrections officials. Appellant does not contend, nor does the record reflect, that appellee is a *direct* threat to the safety and well being of others or that he is protesting any prison policies or attempting to manipulate an official.

In *Harper*, 494 U.S. at 227 n. 11, 110 S.Ct. 1028, a schizophrenic prisoner sought to enjoin the State from requiring him to submit to the injection of antipsychotic drugs. The inmate had a history of "serious, assaultive behavior" that worsened while he was not medicated. *Id.* Ultimately, the Court held that the State had a legitimate penological interest in forcibly medicating an inmate who otherwise would pose a threat to both himself and others. *Id.* at 225, 110 S.Ct. 1028. This interest, however, emanated not from the mere fact that the inmate was ill; rather, it stemmed from the fact that the illness itself was the "root cause of the threat." *Id.* at 225–26, 110 S.Ct. 1028. Unlike the inmate in *Harper*, appellee's kidney failure cannot conceivably result in his posing a significant and direct danger to himself or others. Kidney failure, in contrast to untreated schizophrenia, simply is not the kind of "root cause" of violence contemplated in *Harper*. As dis-

cussed *supra,* we see no evidence that appellee's refusal has caused disruption or that his refusal will foster violence by appellee or his fellow inmates.

Other cases to which appellant cites are equally distinguishable from the instant case. *N.C. Prisoners' Labor Union, Inc.,* 433 U.S. at 133, 97 S.Ct. 2532, denied inmates the right to form a prisoners' labor union. The Supreme Court held that, because a labor union's primary purpose is to entertain grievances against prison officials, allowing prisoners to form a labor union would encourage adversarial and combative relations with institution officials and would thus likely increase violence. *Id.* In *Myers,* 399 N.E.2d at 458, the Supreme Judicial Court of Massachusetts held that Massachusetts prison officials had the authority to administer dialysis to an inmate over his objection. However, unlike appellee in the present case, the inmate in *Myers* was seeking to protest his transfer from a minimum to maximum security prison. *Id.* at 454. The *Myers* Court held that, because his refusal constituted an "attempt to manipulate his placement within the prison system," his protest could have encouraged other inmates to attempt "similar forms of coercion in order to attain illegitimate ends." *Id.* at 457–58. Similarly, in *Vogel,* 537 N.W.2d at 364, the Supreme Court of North Dakota upheld the State's authority to force a diabetic inmate to submit to medical treatment. As in *Myers,* the *Vogel* Court determined that the inmate's refusal was an act of "blackmail against prison officials" and a "blatant attempt to manipulate his placement within the prison system." *Id.* at 363.

Appellant's reliance on the line of decisions relating to the force-feeding of inmates who refused to eat is equally misplaced. In *Narick,* 292 S.E.2d at 55, 58, the Supreme Court of Appeals of West Virginia held that the State could force-feed a prisoner engaged in a hunger strike, who was *protesting* prison conditions. In *Kallinger,* 580 A.2d at 889, the Commonwealth Court of Pennsylvania held that prison officials had the authority to force-feed a hunger striking prisoner based on the Court's finding that the inmate behavior might have been *motivated by a desire to be transferred* to another facility. In

each of these instances, the inmate had an ulterior motive underlying the refusal to eat.

Of great concern to appellant is that, if we were to hold that appellee can rightfully refuse dialysis and other related treatment, other inmates may attempt to manipulate corrections officials or prison policies by refusing medical treatment. This argument fails for multiple reasons. First, as many other courts have consistently held, discussed *supra*, a prisoner may be compelled to accept medical treatment or nutrition if there is an ulterior motive or purpose. Here, no evidence has been presented, nor does appellant contend that appellee has an ulterior motive or purpose in his refusal to accept medical treatment. Our holding that a prisoner in appellee's circumstances may refuse medical treatment would be unavailing to a prisoner who attempts to manipulate a prison policy or official. Second, unlike a hunger strike or refusal to eat, appellee's circumstances are limited and personal. Where inmates attempt to manipulate a prison official or policy by refusing to eat because *all* inmates have to eat and any one of them could go on a hunger strike, permitting one inmate will encourage or incite other inmates to refuse to eat in order to achieve a given objective. However, unlike the cases cited by appellant regarding an individual prisoner's refusal to eat, the likelihood of other inmates replicating appellee's actions is less likely. Another inmate would necessarily have to satisfy the four-part *Mack* test discussed *supra* and he would have to suffer from a life-threatening or terminal illness requiring treatment that he could refuse. As we see it, few of the 23,000 inmates in appellant's care would *attempt* to replicate appellee's circumstances here.[7]

---

7. Appellant cites to several other decisions in which a hunger-striking inmate was compelled to accept medical treatment and nutrition to keep the inmate alive. In all of these cases, however, the inmate was protesting a prison policy, attempting to manipulate a prison official, or was clearly in violation of one of the four *Mack* factors, such as attempting suicide, discussed *supra*. *Mack*, 329 Md. 188, 210, n. 7, 618 A.2d 744 (citation omitted).

## CONCLUSION

Applying the *Mack* factors to the instant case does not implicate compelling appellee to accept dialysis and related medical treatment. Appellee is a competent adult who made a conscious choice to refuse medical treatment. Appellee is not attempting to commit suicide, no innocent third parties are harmed by appellee's decision and no evidence has been presented that the ethical integrity of the medical profession is being harmed. Furthermore, appellee is not a danger to himself or others and he is not attempting to manipulate prison officials or fulfill any other ulterior motive. Appellant's attempt to draw a parallel between the theoretical harm of a ruling in appellee's favor and the *direct* harm in the aforementioned cases—the "ripple effect"—is unpersuasive. Appellee has thus far created no disturbance or disruption from his actions and appellant's further assertions that the "morale" of the prison staff and inmate population would be harmed by appellee's election to forego dialysis and medical treatment is equally unavailing. Finally, although courts should consider "the impact of the asserted constitutional rights ... on the allocation of prison resources generally," appellant has provided no authority whereby such a consideration, in and of itself, justifies compelling appellee to accept medical treatment, which is effectively what we would be doing if we were to hold otherwise.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**