No. 115,897

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GAREN W. STOCKWELL,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee.*

SYLLABUS BY THE COURT

1.

A person who has been involuntarily confined by the State can file a habeas-corpus petition under K.S.A. 2016 Supp. 60-1501 to challenge the conditions of his confinement. To obtain relief, he or she must show either (1) shocking or intolerable conduct in his or her treatment or (2) continuing mistreatment of a constitutional nature.

2.

Every competent person has a constitutionally protected liberty interest to refuse unwanted medical treatment. That right applies to those who have been involuntarily committed to the Kansas Sexual Predator Treatment Program.

3.

The State of Kansas, which administers a Sexual Predator Treatment Program, must use reasonable efforts to inform its staff of a patient's do-not-resuscitate request and to have its staff act in accordance with that request should a situation covered by it arise.

Appeal from Pawnee District Court; BRUCE T. GATTERMAN, judge. Opinion filed June 23, 2017. Reversed and remanded with directions.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Kimberly M.J. Lynch*, senior litigation counsel, Kansas Department for Aging and Disability Services, for appellee.

Before LEBEN, P.J., POWELL and SCHROEDER, JJ.

LEBEN, J.: Since 1997, Garen Stockwell has lived at Larned State Hospital, though not by choice: He was involuntarily committed to the hospital's Sexual Predator Treatment Program because of the substantial risk that he would reoffend if left at large. Although he can't leave the state-hospital grounds, he retains most of his civil rights because he has been placed in custody in a civil proceeding, not sent to prison for a crime.

When Stockwell sought to exercise one of those civil rights—the right to refuse medical treatment—hospital staff said he had no right to enter an advance directive like a do-not-resuscitate order, and Stockwell filed suit. Under court order, hospital staff then gave him a form he could fill out to request that he not be resuscitated if he stopped breathing or his heart stopped beating as well as a living-will form. Hospital staff put the completed forms in Stockwell's medical file but told him that under the hospital's policies, it would not honor his requests unless and until two physicians had determined that he was terminally ill. Since Stockwell has no terminal illness, he concluded that hospital staff were violating his rights and sought further relief from the district court.

A person like Stockwell, who has been involuntarily confined by the State, can file a habeas-corpus petition under K.S.A. 2016 Supp. 60-1501 to challenge the conditions of his confinement. To obtain relief, he must show either (1) shocking or intolerable conduct in his treatment or (2) continuing mistreatment of a constitutional nature. See *Merryfield v. State*, 44 Kan. App. 2d 817, Syl. ¶ 1, 241 P.3d 573 (2010). Stockwell claims continuing

2

mistreatment of a constitutional nature in the denial of his constitutional right to control the medical treatment he receives. The district court concluded that the hospital's policies didn't violate Stockwell's rights, and Stockwell has appealed to our court.

When the district court denies a habeas petition under K.S.A. 2016 Supp. 60-1501 after hearing evidence from both sides, as it did here, we first review the district court's factual findings to be sure that they are supported by substantial evidence and are sufficient to support the court's legal conclusions. *Rice v. State*, 278 Kan. 309, 320, 95 P.3d 994 (2004); *Hooks v. State*, 51 Kan. App. 2d 527, 530, 349 P.3d 476 (2015). We then review the district court's legal conclusions independently, without any required deference to the district court. *Rice*, 278 Kan. at 320. Whether Stockwell's constitutional rights have been violated is a legal matter, so we review it independently. See *In re Habeas Corpus Application of Pierpoint*, 271 Kan. 620, 627, 24 P.3d 128 (2001).

The facts are relatively straightforward and not in dispute. Following an initial court ruling, Stockwell filled out two forms and submitted them to the hospital. One was a do-not-resuscitate (DNR) request; the other was a living will. The hospital placed them in Stockwell's medical file but also advised him that these directives are only honored if certain conditions set out in written policies are met.

Under those policies, for his DNR request to be honored, two physicians must first determine either (1) that he has a terminal condition and that CPR, ventilation, intubation, defibrillation, or a combination of those steps would only forestall death temporarily or (2) that he has an illness "for which further treatment . . . would not likely prolong the life of the patient other than by artificial means . . . ." In either situation, he must have some condition that would be expected to end his life; no such condition has been diagnosed in Stockwell. Similarly, for his living will to be honored, "two physicians must agree that death will occur whether or not the medical procedure or intervention is done." In other words, the living will is honored only if Stockwell has a terminal illness.

3

That presents no problem with respect to the living will Stockwell has signed—by its own terms, it takes effect only if he "should have an incurable injury, disease, or illness certified to be a terminal condition by two (2) physicians who have personally examined me . . . ." But there's a real dispute about the effect of Stockwell's DNR request. He wants the hospital to honor it whether or not he has a terminal illness; should his heart stop beating or he stop breathing, he wants no action taken to revive him. Under the hospital's written policies, though, it doesn't enter an actual DNR *order* (which it calls a directive) unless the person has both a terminal illness (confirmed by two physicians) and a DNR request.

Does the hospital's policy violate Stockwell's constitutional rights? In the *Cruzan* case, the United States Supreme Court declared that every "competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990); see *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) ("We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."); *Conservatorship of Wendland*, 26 Cal. 4th 519, 533, Cal. Rptr. 2d 412, 28 P.3d 151 (2001) ("[T]he competent adult's right to refuse medical treatment may be safely considered established."); *Thor v. Superior Court*, 5 Cal. 4th 725, 744, 21 Cal. Rptr. 2d 357, 855 P.2d 375 (1993) ("The right does not depend upon the nature of the treatment refused or withdrawn; nor is it reserved to those suffering from terminal conditions."); *In re Guardianship of Browning*, 568 So. 2d 4, 10 (Fla. 1990) ("A competent individual has the constitutional right to refuse medical treatment regardless of his or her medical condition."). Both prison inmates and those civilly committed under the Sexually Violent Predator Act maintain this right even though their liberty has been significantly limited in other ways. See *Turner v. Safley*, 482 U.S. 78, 89-91, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987); *Merryfield v. Kansas Dept. of Aging & Disability Services*, No. 111,204, 2015 WL 326652, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 302

4

Kan. 1010 (2015). And though he is confined due to the likelihood he might reoffend and is subject to treatment for any underlying condition that leads to criminal sexual offenses, Stockwell has not been determined mentally incompetent. So Stockwell's right to refuse unwanted medical treatment is well-established and constitutional in nature.

The district court found no violation of this right, in part because a person living in the City of Larned or elsewhere—not in custody at the state hospital—wouldn't be able to ensure that everyone would follow his or her DNR request, either. For example, a person who has a written DNR request might well collapse on the street, where a passerby might administer CPR or call an ambulance. As the district court noted, "An individual who is not a resident of [the Sexual Predator Treatment Program] might have an identical concern. There are no absolute guarantees of enforcement of a DNR."

While that's true, there's a key difference between Stockwell and the ordinary person on the street: Stockwell is in state custody.

If Stockwell has a right to refuse unwanted medical treatment—and he does—then the State surely must use reasonable efforts to accommodate his exercise of that right as a person in state custody. While the hospital made *some* effort to accommodate Stockwell's exercise of that right by placing his DNR request in his medical file, the accommodation was made largely ineffective by the hospital's policy that a DNR order won't be issued except in cases of terminal illness confirmed by two physicians. Although a person on the street may not be able to ensure that his or her DNR request is honored in the case of sudden cardiac arrest or respiratory failure, Stockwell isn't a person on the street. He's a person in state custody, so the State must bear some responsibility for ensuring that his constitutional right to refuse unwanted medical treatment is protected.

In response to Stockwell's exercise of his constitutional right through his DNR request, the State has not shown that accommodating that request will have any

detrimental effect, that its failure to accommodate the request furthers some significant governmental interest, or that any other factor is present here that might allow the government to override this exercise of a person's constitutional rights. See *Chubb v. Sullivan*, 50 Kan. App. 2d 419, 440-44, 330 P.3d 423, *rev. denied* 300 Kan. 1103 (2014). Understandably, the State also did not argue that it would face potential legal liability for following Stockwell's DNR request: Kansas law gives health-care providers immunity when they in good faith honor a DNR request. See K.S.A. 65-4944. We therefore hold that the hospital must use reasonable efforts to inform its staff of Stockwell's DNR request and to have its staff act in accordance with his DNR request should a situation covered by it arise.

We limit our holding to a requirement that the hospital use reasonable efforts; it is not our place to micromanage the Larned State Hospital. The district court will retain jurisdiction to enforce its judgment should a dispute arise as to whether the hospital undertakes reasonable efforts.

Before we close our opinion, we must make four brief points in response to our colleague's dissenting opinion:

- The dissent suggests that "Stockwell demands *advance* assurances that his DNR directive will be honored, apparently under *any* circumstance." Slip op. at 9 (Powell, J., dissenting). But we have not granted so broad an order. We have only required reasonable efforts to comply with his constitutional right to refuse medical treatment.
- The dissent rightly notes that there are situations in which state employees would not have to comply with the DNR request, such as if Stockwell somehow induced cardiac arrest in a suicide attempt. But reasonable efforts would not require cooperation in a suicide attempt. See *Self v. Milyard*, 2012 WL 3704958, at *8 (D. Colo. 2012) (noting that a prison must have "a reasonable and effective method" of assuring that an inmate's DNR will be honored in the event of cardiac or

6

respiratory failure resulting from anything other than attempted suicide or homicide).

- The dissent suggests that "[t]he fact that Stockwell is in state custody does not change" his right to have the State honor his DNR request. Slip op. at 10 (Powell, J., dissenting). But state custody makes all the difference. Our constitutional rights protect us from *governmental* interference, not from that of our neighbors. For example, evidence obtained by a trespassing neighbor can be admitted in a criminal trial even though evidence obtained without a warrant by a trespassing police officer cannot. And though we have a right to free expression on the public square, we have no right to free expression in our neighbor's dining room. Similarly, if a person with a DNR has a heart attack on a sidewalk and is resuscitated by a passing stranger, the government hasn't interfered with that person's right to refuse medical treatment—only the passing stranger has. But if Stockwell has a heart attack in his room at Larned and is resuscitated by a state-hospital employee, the government *has* interfered with his right to refuse medical treatment. Stockwell is in state custody; the least the State must do is to use reasonable efforts to accommodate his exercise of his constitutional rights.
- The dissent argues that neither this court nor a state hospital can limit a physician's unfettered prerogative to determine when a DNR order is medically appropriate. But a state-employed physician cannot act contrary to a patient's constitutional rights. And Stockwell has the right to refuse medical treatment.

The judgment of the district court is reversed, and this case is remanded for the district court to enter judgment in favor of Garen Stockwell, requiring that the Larned State Hospital use reasonable efforts to inform its staff of Stockwell's DNR request and to have its staff act in accordance with his DNR request should a situation covered by it arise; to retain jurisdiction to enforce the judgment as needed; and to issue any further orders consistent with this opinion.

7

* * *

POWELL, J., dissenting: Because I agree with the district court that Larned State Hospital reasonably accommodated Stockwell's wishes that his DNR directive be followed in instances where it is medically appropriate in the opinion of Stockwell's attending physician, I dissent.

The majority declares, relying on *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990), that Stockwell has a "'constitutionally protected liberty interest in refusing unwanted medical treatment.'" Slip op. at 4. While as a general proposition I agree that Stockwell has a right to refuse unwanted treatment, strictly speaking, the United States Supreme Court has *not* held that the right to refuse unwanted medical treatment emanates from the Due Process Clause of the United States Constitution. See *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) ("We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."); *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 514 (10th Cir. 1998) (Supreme Court merely *assumed* right to discontinue lifesaving treatment). But see *Mack v. Mack*, 329 Md. 188, 211, 618 A.2d 744 (1993) (Although *Cruzan* made "no holding on the subject, all of the justices, save Justice Scalia, either flatly stated or strongly implied that a liberty interest under the Fourteenth Amendment gives rises to a constitutionally protected right to refuse lifesaving hydration and nutrition."). A number of state high courts have stated that the right to refuse treatment is a corollary to the common-law doctrine of informed consent which prohibits a physician from treating a competent adult under nonemergency situations without the prior consent of the patient. See *In re Estate of Longeway*, 133 Ill. 2d 33, 43-45, 549 N.E.2d 292 (1989); *Mack*, 329 Md. at 210; *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 746-47, 370 N.E.2d 417 (1977); *Matter of Conroy*, 98 N.J. 321, 348, 486 A.2d 1209 (1985); *Matter of*

8

*Storar*, 52 N.Y.2d 363, 376-77, 438 N.Y.S.2d 266, 420 N.E.2d 64, *cert. denied* 454 U.S. 858 (1981).

Regardless of the source of the right to refuse unwanted medical treatment, such a right is not absolute. See, *e.g.*, *Cruzan*, 497 U.S. at 279 (whether right to refuse treatment has been violated requires balancing such liberty interests with relevant state interests); *Jurasek*, 158 F.3d at 514 (right to refuse treatment could be outweighed by state's interests in preserving life); *State v. McAfee*, 259 Ga. 579, 580, 385 S.E.2d 651 (1989) (right to refuse medical treatment is not absolute); *Brophy v. New England Sinai Hosp., Inc.*, 398 Mass. 417, 432, 497 N.E.2d 626 (1986) (same); *McKay v. Bergstedt*, 106 Nev. 808, 813-14, 801 P.2d 617 (1990) (same); *Matter of Farrell*, 108 N.J. 335, 348, 529 A.2d 404 (1987) (same); *Satz v. Perlmutter*, 362 So. 2d 160, 162 (Fla. Dist. App. 1978) (same); see also *Boone v. Boozman*, 217 F. Supp. 2d 938, 955-57 (E.D. Ark. 2002) (state's requirement that public school students be immunized overrides right to refuse treatment). In particular, the right to refuse medical treatment is subject to "at least four countervailing State interests: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession." *Brophy*, 398 Mass. at 432; *Stouffer v. Reid*, 184 Md. App. 268, 278, 965 A.2d 96 (2009).

The rub here is that Stockwell demands *advance* assurances that his DNR directive will be honored, apparently under *any* circumstance. Of particular concern, given Stockwell's insistence on advance assurances that his DNR directive will be respected, is the State's interest in preventing suicide. One can imagine Stockwell, given his present circumstances, attempting to take his own life by inducing cardiac or respiratory arrest. My fear is that the State could not intervene to resuscitate him. But no one has a right to commit suicide. *Cruzan*, 497 U.S. at 293 (Scalia, J., concurring). Moreover, the United States Supreme Court has specifically upheld the right of a state to forbid the assisting in one's suicide. *Glucksberg*, 521 U.S. at 735. Kansas law criminalizes assisting suicide, see

K.S.A. 2016 Supp. 21-5407, and family members are even allowed to bring a civil action to prevent a possible assisted suicide and to collect damages. See K.S.A. 60-4401 *et seq.* (the Prevention of Assisted Suicide Act.) Additionally, institutions with persons under their care or custody have an affirmative duty to take reasonable actions to prevent suicide. See *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 221-28, 262 P.3d 336 (2011) (duty to protect inmate against unreasonable risk of harm, including risk arising out of his own conduct). Therefore, Stockwell is not entitled to have his DNR directive respected in the instance where it is apparent that Stockwell himself induced cardiac or respiratory arrest or where Stockwell had someone do it for him.

Additionally, I agree with the district court that beyond the specific instances authorized by the Natural Death Act, K.S.A. 65-28,101 *et seq.*, and the language contained in the DNR directive itself, Stockwell is not entitled to any specific assurances because no one is. The Natural Death Act allows a qualified patient—defined as one "who has been diagnosed and certified in writing to be afflicted with a terminal condition by two physicians who have personally examined the patient"—to refuse any life-sustaining procedure—defined as "any medical procedure or intervention which, when applied to a qualified patient, would serve only to prolong the dying process and where . . . death will occur whether or not such procedure or intervention is utilized." K.S.A. 65-28,102(e), (c); K.S.A. 65-28,103. Moreover, the DNR directive signed by Stockwell does not mandate that it be respected in all circumstances but only in instances where Stockwell's attending physician certifies in writing that the DNR directive is medically appropriate. See K.S.A. 2016 Supp. 65-4942. The fact that Stockwell is in state custody does not change this. This court (and Larned State Hospital) has no authority to order Stockwell's attending physician, whether employed by the state or not, to certify his DNR directive as medically appropriate when in the professional judgment of that physician it is not.

10

Finally, Stockwell's demand that his DNR directive be followed in circumstances outside the conditions outlined above is problematic. As the district court indicated, apparently Stockwell proffered numerous hypothetical situations in which he wanted the hospital to implement his DNR directive. However, given the balancing of interests that must be undertaken when determining the propriety of refusing unwanted treatment outside of the circumstances specifically authorized by statute, a balancing that by its nature is highly fact-sensitive, the district court was correct to conclude that delving into the myriad of factual scenarios simply puts the court in the position of issuing a forbidden advisory opinion. See *Johnson v. State*, 289 Kan. 642, 655, 215 P.3d 575 (2009) (courts are constitutionally prohibited from providing purely advisory opinions).

Accordingly, I would affirm the district court.