993 A.2d 104

**J. Michael STOUFFER, Commissioner of Correction**

**v.**

**Troy REID.**

**No. 54, Sept. Term, 2009.**

Court of Appeals of Maryland.

April 19, 2010.

Michael O. Doyle, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, and Laura Mullally, Assistant Attorney General, Baltimore), on brief, for petitioner.

Stuart O. Simms (Brown, Goldstein & Levy, LLP, Baltimore), on brief, for respondent.

Carmen M. Shepard, Buc & Beardsley, LLP, Washington, DC, and C. Matthew Hill, Public Justice Center, Baltimore, brief of Public Justice Center, Maryland Disability Law Center, American Civil Liberties Union of Maryland, D.C. Prisoners' Project of the Washington Lawyers' Committee for Civil Rights and Urban Affairs, and On Our Own of Maryland, Inc., as Amici Curiae for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

GREENE, J.

The respondent, Troy Reid ("Reid"), an adult male, was committed to the custody of the Commissioner of Correction in 1995 to serve a forty year sentence. Reid's medical history while in the institution revealed a diagnosis of high blood pressure, human immunodeficiency virus and end-stage renal disease.[1] In July 2007, prison medical personnel diagnosed Reid with end-stage renal disease and prescribed the application of kidney dialysis three times per week.[2] Initially, Reid consented to the dialysis treatment; however, even though he understood the medical consequences of ceasing dialysis (serious bodily injury and even death), he eventually requested that all treatment be terminated. As a result of his refusal to submit to kidney dialysis in April 2008, the petitioner, J. Michael Stouffer, Commissioner of Correction ("Commissioner"), filed a complaint in the Circuit Court for Baltimore City seeking declaratory and injunctive relief to compel Reid to submit to kidney dialysis and medical treatment that medical professionals had determined was necessary.

This case presents the question of whether the Commissioner presented sufficient evidence to override a competent adult inmate's right to object to life-sustaining medical treatment.[3] We shall hold that, under the circumstances of the present case, the Commissioner's non-specific claim of preservation of life, safety, and security was insufficient to demonstrate that

---

**1.** End-stage renal disease occurs when the kidneys are no longer able to function or the kidneys completely fail to function, remove waste, or concentrate urine and regulate electrolytes. *See* Hugh R. Brady & Barry M. Brenner, *Acute Renal Failure, in* PRINCIPLES OF INTERNAL MEDICINE 1541 (15th ed.2001).

**2.** Kidney dialysis is an artificial process to replace the kidney function of removing waste and unwanted water from the blood. *See* Robert W. Hamilton, *Atlas of Diseases of the Kidney,* in PRINCIPLES OF DIALYSIS: DIFFUSION CORRECTION AND DIALYSIS MACHINES 5 (1999).

**3.** The specific question presented by the petition for certiorari was: "May the Commissioner of Correction administer life-sustaining medical treatment or nutrition to an inmate over the inmate's objection, where the lack of treatment may cause the inmate's death or serious injury and threaten prison safety, security, and good order?"

Reid's refusal of medical treatment would cause a disruption or impact safety in the institution, or endanger the ethics of the medical profession.

Following a hearing in the Circuit Court for Baltimore City, the court denied the Commissioner's request for an injunction. The Commissioner noted a timely appeal to the Court of Special Appeals. Pending the appeal, the Commissioner obtained a temporary injunction permitting Reid's physicians to continue providing Reid with dialysis and other necessary medical treatment. Prior to expiration of the temporary injunction, the Commissioner filed a petition for a writ of certiorari and a motion for injunction pending appeal, which this Court denied. Subsequently, the Court of Special Appeals affirmed the judgment of the Circuit Court denying the Commissioner's request for an order requiring that Reid submit to kidney dialysis. *Stouffer v. Reid,* 184 Md.App. 268, 965 A.2d 96 (2009). The Commissioner filed an additional petition for a writ of certiorari, which we granted. *Stouffer v. Reid,* 409 Md. 44, 972 A.2d 859 (2009).

## FACTS

The underlying facts are not in dispute. We shall adopt the facts as found by the Circuit Court judge at the hearing held on May 1, 2008, and as subsequently adopted by the Court of Special Appeals in its opinion in *Stouffer,* 184 Md.App. at 273–76, 965 A.2d at 99–100:

> [T]he trial judge, in an oral ruling from the bench, denied [the Commissioner's] request for an permanent injunction and declared that [Reid] had the right to refuse kidney dialysis and other medical treatment:
>
>> [The Commissioner] is the head of the Department of Correction. He ... [has] the responsibility of maintaining the operation of the correctional institutions in the State of Maryland.... [Reid] is an inmate within the Department of Correction ... [and is] a charge of [the Commissioner]. [The Commissioner] has the responsibili-

ty of insuring [safety] ... and provid[ing] proper medical treatment and care for ... inmates.

\* \* \* \*

The testimony submitted by [the Commissioner] ... is that failure to abide by that medical treatment ... would negatively impact this inmate. It would impact his heart, his heartbeat, the regularity of his heartbeat, that may cause a heart attack; is that it would cause fluid to build up in the body that is not being taken out of the body under normal means and that fluid may build up in his leg, in his face, in his lungs, and in his lungs could cause respiratory failure and that respiratory failure could lead to heart attack or death.

\* \* \* \*

[T]he inmate also has high blood pressure and that failure to receive the treatment in question may impact negatively to his high blood pressure. The impact could lead to the heightening of his blood pressure, that also could lead to stroke.[1]

---

1. In addition to end-stage renal failure, [Reid] suffers from human immunodeficiency virus (HIV), high blood pressure and anemia.

\* \* \* \*

Maryland is clear that a mentally competent adult may refuse medical care, even though the refusal may result in his or her death, and that unless there are compelling State interests which override the person's interest in their body's integrity, as the *Mack*[2] case says, is that the Court should recognize it.

2. *Mack v. Mack*, 329 Md. 188, 618 A.2d 744 (1993)[,] articulates four countervailing State interests, which we shall discuss, *infra*.

In this case ... [what the Commissioner] is saying, [Reid], is that he recognizes that you are a competent individual and he recognizes that you have not been a troubling impact overall while in this facility. That is clearly what is being said here is that you have not

disrupted the system; is that it is, in fact, raising the question of concern (a) for your health and trying to make sure that you receive the medical treatment that he and the medical providers say are necessary. . . . [I]t's been determined by the doctors that you need this treatment.

\* \* \* \*

[M]y concern is as to whether or not the countervailing State interest in this case, as identified by the Court of Appeals, does apply. One of the countervailing factors is preserving your life.

The other is around the safety and the safety of others and whether or not it's there. Well, I'm not hearing that you're doing this to cause [something to happen] and . . . that it will simply pass. . . . The Court's question of [Reid] is he trying to kill himself and he said, no, that's not the case, and so prevention of suicide is not it.

The maintenance of ethical integrity of the medical profession or the medical treatment is the last point of the balancing . . . [and] the medical profession has made it clear is that they believe this is needed.

\* \* \* \*

I don't like playing Russian roulette with anyone's life. . . . However, on this date, the Court is satisfied that the inmate is aware that he has been advised that the medical treatment that's being offered to him is appropriate and necessary, and that refusal to receive that medical treatment maybe harmful to him.

This Court believes that [Reid] is competent, but ill-informed in his own wisdom. However, the Court denies the request at this time. The motion for permanent injunction is denied.

In a written order issued on May 2, 2008, the trial court denied [the Commissioner's] request for a permanent injunction and issued a declaratory judgment on May 6, 2008, memorializing the May 1, 2008 oral ruling. The trial court

based its declaratory judgment that "the state interests in forcing [Reid] to undergo dialysis does not outweigh [Reid's] right to refuse medical care on the following:

(1) [Reid] has been diagnosed with, among other medical conditions, end-stage kidney disease, for which he should receive dialysis three times a week. [Reid] has refused this treatment.

(2) There has been no argument or suggestion that [Reid] is not a competent adult.

(3) [The Commissioner], in his responsibility to oversee and maintain the proper medical care of prisoners, has petitioned this court requesting permanent injunctive relief.

(4) Citing *Mack v. Mack, supra,* the court concluded that a patient has a right to refuse treatment, but this right is not absolute. This right must be balanced against the state interests of the preservation of life, protection of innocent third parties interests, suicide prevention, and the maintenance of the ethical integrity of the medical profession.

(5) [Reid] is not contemplating suicide, nor is there evidence that his refusal has caused any disruption in the operation of the prison system, nor is there any indication that he seeks to cause a disturbance.

(6) [The Commissioner] showed proper concern for the negative impact [Reid's] choice could have upon the prison community, but there has been no evidence presented that [Reid] has made any attempt to disrupt the order of the prison, nor is there any evidence suggesting the actions of [Reid] would cause disruption to the prison community, and no evidence has been presented showing that [Reid's] choice has harmed the integrity of the medical profession.

Additional facts will be presented as necessary for purposes of our discussion.

500

## DISCUSSION

The Commissioner contends that he is entitled to compel Reid to submit to kidney dialysis and medical treatment because the State's legitimate interest in the orderly and safe operation of the state prison system outweighs Reid's right to refuse medical treatment. According to the Commissioner, both the Court of Special Appeals and the Circuit Court "failed to give appropriate deference to the Commissioner and Assistant Commissioner regarding the impact of Reid's refusal to receive life-sustaining medical treatment." The intermediate appellate court's conclusion that the State has not shown a legitimate penological interest in forcing Reid to submit to dialysis, the Commissioner contends, "overlooks the effect of the inmate's refusal to receive life-sustaining treatment on prison security." Finally, the Commissioner maintains that "the State's interest in preserving Reid's life" and the need to "maintain ... the ethical integrity of the medical profession outweigh[ ] Reid's limited right to refuse medical treatment" and "his limited interest in refusing medical treatment."

To the contrary, Reid contends that "[the Commissioner] failed to establish a sufficient factual basis constituting a countervailing State interest under *Mack v. Mack*, 329 Md. 188, [618] A.2d [744] (1993)." In addition to failing to establish "any of the four factors enumerated in *Mack v. Mack, supra*," Reid maintains that we should reject the Commissioner's invitation to expand our decision in *Mack*, thereby creating an exception that would override Reid's qualified common law right to refuse medical treatment. According to Reid, the evidence does not support the conclusion that his refusal to accept medical treatment constituted a threat to maintenance of prison security and order.

Moreover, Reid points out that the State's authority over prisons and the need to maintain security does not automatically afford the Commissioner the discretion to compel an inmate to submit to medical treatment. Reid maintains that the evidence in this case does not support the proposition that he had any specific intent to "manipulate corrections officials

or prison policies." Thus, according to Reid, "[a] significant component in assessing penological interest, is whether there is the presence of a direct threat, a protest or manipulation of prison officials." Reid asserts that here, as the Court of Special Appeals concluded, no such argument was advanced by the Commissioner nor does the record reflect that Reid "is a direct threat to the safety and well being of others" or "that [Reid] is protesting any prison policies or attempting to manipulate an official." Finally, Reid contends that his decision to refuse medical treatment did not threaten the integrity of the medical profession because it was an informed decision made with full knowledge of the risks involved in refusing medical treatment.

As the Court of Special Appeals observed, the Commissioner attempts to distinguish this case from *Mack*, 329 Md. 188, 618 A.2d 744, on the basis that in *Mack* we did not address the unique circumstances involved when the right to refuse medical treatment is asserted by a prison inmate. We note at the outset that the *Mack* case did not involve a prison inmate's refusal to accept medical treatment. In *Mack*, in the context of whether Maryland law authorized the withholding of life support to a previously competent, adult ward of the court, we had occasion to review the right of a patient, generally, under Maryland law to refuse medical treatment. *Mack*, 329 Md. at 210–11, 618 A.2d at 755–56. We explained that the "fountainhead of the doctrine [of informed consent] is the patient's right to exercise control over his own body, ... by deciding for himself [or herself] whether or not to submit to the particular therapy." *Mack*, 329 Md. at 210, 618 A.2d at 755 (quoting *Sard v. Hardy*, 281 Md. 432, 439, 379 A.2d 1014, 1019 (1977)). Further, we pointed out that "[a] corollary to the doctrine is the patient's right, in general, to refuse treatment and to withdraw consent to treatment once begun." *Id.*

In acknowledging this common law right of a mentally competent patient to refuse medical treatment under non-emergency circumstances, we emphasized that it is not an absolute right. It is a right subject to "at least four counter-

vailing State interests: (1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession." *Mack*, 329 Md. at 210 n. 7, 618 A.2d at 755 n. 7 (quoting *Brophy v. New Eng. Sinai Hosp., Inc.*, 398 Mass. 417, 497 N.E.2d 626, 634 (1986)).

In *Mack*, 329 Md. at 211, 618 A.2d at 756, we decided the case before us based upon an application of the common law right of a competent adult to refuse medical treatment. We acknowledged that there is considerable decisional case law in other jurisdictions holding that a person's right to refuse treatment is based on a federal or state constitutional right to privacy, *see, e.g., Rasmussen v. Fleming*, 154 Ariz. 207, 741 P.2d 674, 681–82 (1987), or on a constitutionally protected liberty interest guaranteed by the Fourteenth Amendment to the United States Constitution, *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224, 241–42 (1990). Ultimately, we did not base our decision on constitutional principles. *See Mack*, 329 Md. at 211, 618 A.2d at 756 ("There [was] no issue that turn[ed] on whether the right to refuse treatment is a constitutional or common-law right." Thus, we decided the case "under the Maryland common-law right of a competent adult to refuse treatment.")

In *Mack*, 329 Md. at 210 n. 7, 618 A.2d at 755 n. 7, we identified "at least" four countervailing State interests to consider in determining whether the State's interests outweighed the patient's right to refuse medical treatment. In so doing, we, in effect, acknowledged that there may be other interests. A consideration not directly involved in *Mack*, but directly involved in the present case, is the State's interest in maintaining prison security, order, and discipline. Accordingly, we shall evaluate the inmate's right to refuse medical treatment in light of the State's interest in maintaining a safe and orderly prison under the facts of this case.

The Circuit Court, in rendering its decision, considered the four factors outlined in the *Mack* decision. In addition, the

court determined that "there [has been] no evidence [presented] that [Reid] has caused any disruption in the operation of the prison system, nor is there any indication that he seeks to cause a disturbance." Just as the trial court and the Court of Special Appeals did, we shall review this case in light of the *Mack* factors. Also, we shall consider whether the State's interest in maintaining the safety, security, and good order of its prisons constitutes a legitimate penological interest and whether that interest outweighs Reid's common law right to refuse kidney dialysis. In reviewing this case, we agree with the Court of Special Appeals' assessment that "[t]he present case does not involve a facial challenge to a prison policy or regulation." *Stouffer,* 184 Md.App. at 289, 965 A.2d at 108. In this case, "our focus is very narrow and limited to [the application of a prison policy] to [Reid] and [the] specific circumstance[s]" of this case. *Id.*

### Preservation of Life

The Commissioner contends that we should adopt the reasoning of the Iowa Supreme Court in *Polk County Sheriff v. Iowa District Court for Polk County,* 594 N.W.2d 421 (Iowa 1999), and conclude that, because Reid's condition is treatable and non-terminal, "coupled with the absence of serious side effects, ... the State's interest in the preservation of life weighs heavily in the balance." In addition, the Commissioner maintains that even though there are legal and factual similarities between the present case and *Polk,* the Court of Special Appeals nonetheless disregarded *Polk* and chose to rely on cases that "arose outside a prison context, and [did not] involve[ ] a refusal to undergo kidney dialysis." Accordingly, the Commissioner asserts that this Court should look to both *Polk* and *Commissioner of Correction v. Myers,* 379 Mass. 255, 399 N.E.2d 452 (1979), for guidance and conclude that the State's interest in the preservation of life outweighs the inmates's right to refuse medical treatment.

Reid counters, arguing that "there is nothing in the record of this case that compelled a finding ... [that the State's interest in preserving this patient's life will override the

individual's decision to refuse medical treatment]." According to Reid, the Commissioner's expressed concerns regarding the preservation of life factor simply "are insufficient for [a court] to divest a competent adult of his right to refuse medical treatment." *Stouffer,* 184 Md.App. at 283, 965 A.2d at 105.

The Court of Special Appeals acknowledged "[t]hat [Reid] suffer[s] from kidney disease" and that this fact "was established beyond any doubt at the hearing." *Stouffer,* 184 Md. App. at 280, 965 A.2d at 103. According to Dr. Telda, a physician employed by the State's prison medical contractor, Reid needed to receive "medical treatment and dialysis for his end-stage renal disease and related illnesses," otherwise, "[he] would suffer serious bodily injury or death." *Stouffer,* 184 Md.App. at 279–80, 965 A.2d at 102. The intermediate appellate court also pointed out that "the trial judge expressly acknowledged that [Reid's] failure to accept medical treatment was potentially life-threatening," *Stouffer,* 184 Md.App. at 280, 965 A.2d at 103, and that Reid "is a competent adult who, notwithstanding being 'ill-informed in his own wisdom,' ... expressly stated his desire to forego medical treatment that he finds objectionable." *Stouffer,* 184 Md.App. at 283, 965 A.2d at 104. In reaching the conclusion that the preservation of life factor was not sufficient to overcome a competent adult's choice to refuse medical treatment, the Court of Special Appeals carefully considered the specific facts of this case. The court stated:

> Although [the Commissioner] advances a legitimate concern relating to the "preservation of life" factor, such an interest is not sufficient to overcome a competent adult's choice to refuse medical treatment. Notably, [Reid's] skepticism about his condition arises from the information that was provided to him from medical professionals that turned out to be inaccurate; namely, that he would immediately suffer severe symptoms if he discontinued dialysis, which subsequently did not happen when [Reid] ceased dialysis for weeks at a time. We note the same concerns as the circuit court regarding [Reid's] understanding as to the seriousness of his condition, but such concerns are insufficient for us to

divest a competent adult of his right to refuse medical treatment.

*Stouffer,* 184 Md.App. at 283, 965 A.2d at 104–105.

In *Polk,* 594 N.W.2d at 423, Jerrell Brown, a pre-trial detainee, was held in the Polk County jail awaiting trial on drug related charges. While in jail, he received kidney dialysis treatments three times per week at Lutheran Hospital for a year and subsequently refused to continue with the dialysis treatments. *Polk,* 594 N.W.2d at 424. The County Sheriff filed an application in the district court seeking an order to compel Brown to submit to emergency treatment stemming from his refusal to continue dialysis. *Polk,* 594 N.W.2d at 423. Medical testimony presented at the hearing for emergency treatment revealed that Brown's kidneys were "minimally functional" and unless Brown received the treatment, "he would die within one week," probably due to cardiac arrest. *Id.*

Brown did not testify at the hearing. *Id.* A psychiatrist who evaluated Brown one day before the hearing testified. *Id.* The court considered both his oral testimony and written report. *Id.* According to the psychiatrist, "Brown was competent, appeared to be of at least average intelligence, and understood the risks of … discontinuing the treatment." *Id.* The psychiatrist testified further that, "Brown said that spending any further time in any correctional facility was unacceptable and that he was going to stop his dialysis treatment 'whether he was looking at another month, or another year, or another five years' in incarceration." *Id.* The psychiatrist's report also revealed that Brown stated that "he was tired of the routine of being taken to the hospital in jail garb and in manacles only to have to return to jail." *Polk,* 594 N.W.2d at 425. Further, according to statements in the report attributable to Brown, " '[Brown] … decided to refuse any future dialysis until March 4, 1999,' which according to Brown was his pretrial conference date." *Id.* "When [the psychiatrist] expressed doubt that Brown could live until March 4, Brown responded that he really did not care." *Id.*

As Brown explained, "I'd be dead, so there would be nothing to worry about." *Id.*

The district court judge concluded that under the Fourteenth Amendment to the United States Constitution, Brown's liberty interest was superior to the State's interest in compelling Brown to submit to dialysis. *Id.* As a result, the court rejected the Sheriff's request for an order compelling medical treatment. *Id.* Subsequently, the Sheriff filed a petition for a writ of certiorari in the Iowa Supreme Court, which was granted. *Id.* The Iowa Supreme Court held:

> In balancing Brown's diminished liberty interest to refuse treatment against the State's countervailing interests in preserving life, preventing suicide, protecting the interests of innocent third parties, maintaining the ethical integrity in the medical profession, and maintaining prison security, order, and discipline, we conclude the State's interests must prevail.

*Polk,* 594 N.W.2d at 431.

The court reasoned that ordinarily "a state's interests in [preserving] life are strong, [but] such interests standing alone will usually not preclude a competent person from declining life-sustaining medical treatment." *Polk,* 594 N.W.2d at 426. The underlying rationale for this approach, the court explained, is that "the life the state is seeking to protect in such a situation is the life of the same person who has competently decided to forego the medical intervention; it is not some other actual or potential life that cannot adequately protect itself." *Id.* (internal citation omitted). Notwithstanding, in Brown's case "the State's interest in the preservation of life weigh[ed] heavily in the balance" because "compelling Brown to submit to dialysis 'd[id] not involve a situation where 'heavy physical and emotional burdens' would be imposed to effect a brief and uncertain delay in the natural process of death.' " *Polk,* 594 N.W.2d at 427 (quoting *Myers,* 399 N.E.2d at 456). In its analysis, the Iowa Supreme Court indicated that the State's interest in the preservation of life "d[id] not alone control Brown's right to refuse treatment." *Id.* In addition,

the court reasoned that it "must also factor into [the] balancing process the magnitude of the invasion brought about by dialysis." *Id.* Thus, in the court's view, the degree of invasiveness was minimal.

Apparently, the fact that death was certain, in the event that Brown discontinued dialysis, and that the dialysis procedure "is not painful and produces no serious side effects" informed the Iowa Supreme Court's decision that the State's interest in preserving life weighed heavy in the balance. *Id.* In rendering its decision, the court gave little or no consideration to the mental and emotional pain to Brown resulting from unwanted kidney dialysis treatment. *Polk,* 594 N.W.2d at 433 (Snell, J., dissenting); *see also Brophy,* 497 N.E.2d at 637 (acknowledging that "the invasiveness of the treatment sought to be terminated is an important factor to be considered in balancing the individual's and the State's interests," but agreeing to adopt the view expressed by the New Jersey courts that "the primary focus should be the patient's desires and experience of pain and enjoyment—not the type of treatment involved") (internal citations omitted); *Myers,* 399 N.E.2d at 457 (noting that dialysis "is a relatively complex procedure, which requires considerable commitment and endurance from the patient who must undergo the treatment three times a week"). In addition, as Justice Snell's dissenting opinion in *Polk* points out, the majority in *Polk* "fundamentally undervalued the liberty interest of the Fourteenth Amendment" when it "recognized the State's interests as supreme even though they are totally unsupported by the evidence." *Polk,* 594 N.W.2d at 434 (Snell, J., dissenting). Further, the majority disregarded the principle announced by the United States Supreme Court in *Cruzan* that "no person or court should substitute its judgment as to what would be an acceptable quality of life for another." *Polk,* 594 N.W.2d at 434 (Snell, J., dissenting) (quoting *Cruzan,* 497 U.S. at 275, 110 S.Ct. at 2849, 111 L.Ed.2d at 239 (internal citation omitted)).

We simply are not persuaded that the State's interest in the preservation of life outweighs Reid's right to refuse medical

treatment. Reid was skeptical about his medical condition because "the information that was provided to him from medical professionals . . . turned out to be inaccurate." *Stouffer*, 184 Md.App. at 283, 965 A.2d at 104. The information provided to him was "that he would immediately suffer severe symptoms if he discontinued dialysis, which subsequently did not happen when [Reid] ceased dialysis for weeks at a time." *Stouffer*, 184 Md.App. at 283, 965 A.2d at 104–05. Even though Reid was "ill-informed in his own wisdom," as found by the trial judge, he expressly refused to continue with "medical treatment that he [found] objectionable." *Stouffer*, 184 Md. App. at 283, 965 A.2d at 104. As the Court of Special Appeals noted:

> [W]hen a competent adult refuses medical treatment, the State's interest in preserving the particular patient's life will not override the individual's decision. Even in cases where a patient's condition is curable, the State's interest in preserving life is diminished because the life that the [S]tate is seeking to protect in such a situation is the life of the same person who has competently decided to forgo the medical intervention. The State's duty to preserve life must also encompass a recognition of an individual's right to avoid circumstances in which the individual himself would feel that efforts to sustain life demean or degrade his humanity.

*Stouffer*, 184 Md.App. at 282–83, 965 A.2d at 104 (citations omitted).

### Maintaining Prison Security, Order, and Discipline

■ The State's interest in maintaining orderly prison administration is a consideration in this case, but was not a consideration in *Mack*, 329 Md. 188, 618 A.2d 744, because the facts in that case did not involve prisons or prisoners. The United States Supreme Court has said:

> The interest in preserving order and authority in the prisons is self-evident. Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration. Responsible prison

officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.

*Jones v. North Carolina Prisoners' Labor Union, Inc.* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629, 643 (1977). In *Jones,* 433 U.S. at 125, 97 S.Ct. at 2537–38, 53 L.Ed.2d at 638, the Supreme Court recognized that "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, [to the extent that those rights] are implicit in incarceration." [4]

 Despite their incarceration, inmates "do not forfeit all constitutional protections." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447, 472 (1979). Inmates retain certain common law and constitutional protections. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). For example, generally a convicted person retains the freedom of speech and religion and "may claim the protection of the Due Process Clause to prevent additional deprivation of life, liberty, or property without due process of law." *Bell,* 441 U.S. at 545, 99 S.Ct. at 1877, 60 L.Ed.2d at 472.

---

**4.** It is clear that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Jones v. North Carolina Prisoners' Labor Union, Inc.* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629, 638 (1977) (internal quotations omitted). Likewise, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights" of inmates. *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 473 (1979). The test is "when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in light of the central objective of the prison administration, safeguarding institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878, 60 L.Ed.2d at 473.

■ Furthermore, a competent person has a constitutional right to refuse unwanted medical treatment. *See Cruzan,* 497 U.S. at 277, 110 S.Ct. at 2851, 111 L.Ed.2d at 241 (noting that the "doctrine of informed consent is viewed as generally encompassing the right to refuse treatment" and that this principle is firmly established in law); *but see Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178, 197–98 (1990) (holding that forcing the injection of medication into a non-consenting individual's body represents a substantial interference with that individual's liberty, although this interest may be outweighed by the State's interest in maintaining prison security). Maryland common law and statutory law also protect a patient's right to make informed choices about medical care and "[do] not allow a physician to substitute his judgment for that of the patient in the matter of consent to treatment." *McQuitty v. Spangler,* 410 Md. 1, 20, 976 A.2d 1020, 1031 (2009) (recognizing the well-settled principle of informed consent and that "personal autonomy and personal choice were the primary foundation of the informed consent doctrine") (internal citation omitted); *Williams v. Wilzack,* 319 Md. 485, 508, 573 A.2d 809, 820 (1990) (pointing out that under the provisions of Md.Code (1982, 1988 Supp.), § 10–708 of the Health–General Article, the General Assembly intended "to create a justifiable expectation that ... drugs will not be administered to an inmate unless he is mentally ill and a danger to himself or others"); *Sard,* 281 Md. at 439, 379 A.2d at 1019 (acknowledging that under common law principles "a physician, treating a mentally competent adult under non-emergency circumstances, cannot properly undertake to perform surgery or administer other therapy without the prior consent of his patient").

■ In the prison context, an inmate's exercise of constitutional and common law rights must be balanced against the interests of corrections officials. *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28, 40–41 (1982) ("[W]hether [an individual's] constitutional rights have been violated must be determined by balancing his [or her] liberty interests against the relevant state interests."); *Pell,*

417 U.S. at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501. Although due deference should be accorded the corrections authorities' informed assessment of their penological objectives and administrative needs, the court will intervene where prison regulations or practices imperil constitutional rights. *Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224, 236 (1974) ("When a prison regulation or practice offends a fundamental constitutional guarantee, . . . courts [must] discharge their duty to protect constitutional rights.").

■ Where there is a reasonable connection between a prison regulation or policy imposed and the penological objective at issue, the prison regulation or policy will be considered valid. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, 79 (1987). Ordinarily, courts defer to prison officials to make difficult judgments concerning institutional operations. *Id.* In determining whether a regulation, policy, rule or restriction impermissibly burdens the exercise of a constitutional right, the United States Supreme Court, in *Turner*, directs the court to assess the overall reasonableness of the institutional restriction on the exercise of an inmate's constitutional rights by weighing four factors. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2262, 96 L.Ed.2d at 79 (quotation omitted). This connection must not be "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262, 96 L.Ed.2d at 79. Prison regulations or policies based upon "exaggerated" concerns are not reasonably related to any state interest. *Turner*, 482 U.S. at 97–98, 107 S.Ct. at 2266–67, 96 L.Ed.2d at 84. Moreover, prison regulations and policies grounded on "whims . . . about prospective hypothetical situations" or "speculative and uncertain anxieties" do not satisfy the *Turner* standard of reasonableness. *See Campos v. Coughlin, Commissioner New York State Dep't of Correctional Services*, 854 F.Supp. 194, 209 (S.D.N.Y.1994) (holding that speculation that Santeria beads would exacerbate gang violence was unfounded

when Catholic rosary beads and Christian crosses caused no violence). Likewise, the possibility of an adverse impact upon a governmental interest will not justify the restriction on the exercise of a constitutional right. *See Turley v. Adel Community Sch. Dist.*, 322 F.Supp. 402, 408–09 (S.D.Iowa 1971) (holding that the possibility of disruption due to negative reaction to longhaired students does not sustain a school policy on hair length).

Second, *Turner* requires that a court consider whether inmates retain alternative means of exercising the circumscribed right. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262, 96 L.Ed.2d at 79. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262, 96 L.Ed.2d at 79–80. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262, 96 L.Ed.2d at 80.

The Court of Special Appeals, in the present case, pointed out correctly that the *Turner* analysis "does not assist us in 'balancing the competing interests' of [Reid] and [the State]" because *Turner* involved a facial challenge to a prison regulation. *Stouffer*, 184 Md.App. at 289, 965 A.2d at 108. In other words, the United States Supreme Court, in *Turner*, provided the framework for determining whether a prison regulation or restriction was reasonable on its face. Here, however, we are reviewing a challenge to a specific prison directive as applied to Reid. *See McNabb v. Dep't of Corr.*, 163 Wash.2d 393, 180 P.3d 1257, 1264–65 (2008) (acknowledging that "*Turner* delineates the State's ... compelling interest in maintaining security and orderly administration in its prison system" and the "due deference [given correctional authorities] regarding the manner in which the officials carry out their mandate to provide medical services to incarcerated individuals"). Nonetheless, we agree with the Supreme Court of Washington, in *McNabb*, that the State's interest in maintaining security and order in prison and due deference given to prison officials

"should be considered in addition to the four established compelling state interests" implicated by refusal of medical treatment, as adopted by this Court in *Mack v. Mack*, 329 Md. 188, 618 A.2d 744 (1993), "when determining whether the right of an incarcerated individual to refuse [medical treatment] outweigh[s] the State's interests." *McNabb*, 163 Wash.2d 393, 180 P.3d 1257, 1264–65.

Unlike the present case, in *Polk* there was evidence in the record from which the court could reasonably infer that Brown's motives for refusing medical treatment were manipulative and that his refusing medical treatment would disrupt the day-to-day management of the jail. *Polk*, 594 N.W.2d at 431. Thus, the court in that case was justified in deferring to the professional expertise of correctional authorities, in the absence of any substantial evidence in the record that the correctional officials exaggerated their response to preserve internal order and discipline. *See Polk*, 594 N.W.2d at 430. Furthermore, in *Polk*, the appellate court explained, on the basis of the record before the court, that "the chief jailer's concerns that other inmates would 'copycat' Brown's actions as an excuse to get out of jail" were reasonable and that there was no substantial evidence that "the chief jailer's application to the district court was an exaggerated response to Brown's refusal" to submit to dialysis treatment. *Id.*

The court in *Polk* acknowledged that a State's interests in "[m]aintaining security and preserving internal order and discipline 'are essential goals that may require limitation or retraction of the retained constitutional rights of . . . prisoners.'" *Polk*, 594 N.W.2d at 430 (quoting *Bell*, 441 U.S. at 546, 99 S.Ct. at 1878, 60 L.Ed.2d at 473; *Procunier v. Martinez*, 416 U.S. at 412, 94 S.Ct. at 1811, 40 L.Ed.2d at 239–40 (noting the governmental interests in a prison setting are the preservation of internal order and discipline, the maintenance of institutional security and the rehabilitation of prisoners)).

In *Myers*, 399 N.E.2d at 457, the Supreme Judicial Court of Massachusetts pointed out that, when balancing the governmental interests and the individual's, "wide-raging deference

[must] be accorded the decisions of prison administrators, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response." (Internal citations omitted.) Specifically, as to the facts in *Myers,* the court emphasized that the "correctional needs in [that] case [were] urgent and ought to be given considerable weight," because "the prisoner's refusal of life-saving treatment [was] predicated on an attempt to manipulate his placement within the prison system." *Myers,* 399 N.E.2d at 457–58. Quoting the United States Supreme Court in *Jones,* 433 U.S. at 126 n. 4, 97 S.Ct. at 2538 n. 4, 53 L.Ed.2d at 639 n. 4 (1977), the court in *Myers* noted that

> the "purpose" for exercising a constitutional right "is a factor which prison officials may legitimately consider in determining whether [that exercise] is likely to be a disruptive influence, or otherwise detrimental to the effective administration of the . . . prison system."

*Myers,* 399 N.E.2d at 458 n. 4.

Unlike the situation in *Myers,* there is no evidence in the present case that Reid's refusal of dialysis "treatment is predicated on an attempt to manipulate his placement within the prison system." The trial judge, in the present case, found that the Commissioner "showed proper concern for the negative impact Reid's choice [*i.e.,* refusing to submit to kidney dialysis] could have upon the prison community." Nonetheless, the trial judge found that there "has been no evidence presented that Reid has made any attempt to disrupt the order of the prison," and that there was no "evidence suggesting that the actions of Reid would cause disruption to the prison community." Although the State's interest in "upholding orderly prison administration" in *Myers* and in the present case is a valid consideration, as the court pointed out in *Myers,* "the fact of the [inmate's] incarceration does not *per se* divest him of his right of privacy and interest in bodily integrity." *Myers,* 399 N.E.2d at 457; *see also Thor v. Superior Court,* 5 Cal.4th 725, 21 Cal.Rptr.2d 357, 855 P.2d 375, 388 (1993) (upholding a prison inmate's right to refuse or demand the withdrawal of medical treatment of any form in

the absence of evidence demonstrating a threat to institutional security, public safety or prison officials); *Singletary v. Costello,* 665 So.2d 1099, 1109 (Fla.Dist.Ct.App.1996) (holding that there was no evidence adduced that the inmate's conduct undermined the security, safety or welfare of the prison).

The Commissioner contends that the professional expertise of the Commissioner and Assistant Commissioner as to the detrimental effects of Reid's refusal to receive dialysis treatment should be given deference by the courts. Particularly, the Commissioner maintains that "[w]here ... there is an absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations," the "courts should ordinarily defer to their expert judgment in such matters." Through testimony before the trial court, Commissioner Stouffer expressed "concern that Reid's injury or death as a result of his refusal to receive medical treatment may increase 'angst' within the general population." This the Commissioner predicted would lead "to disruption and disorder through peaceful protests or potentially through acts of violence." In addition, according to Assistant Commissioner Watson's affidavit, filed in these proceedings, "Reid's actions require a 'substantial and disproportionate utilization of limited case management, medical and psychological resources.'" According to the Commissioner, in the Assistant Commissioner's view, as Reid's health deteriorates, the demand upon institutional resources will increase and morale of staff will diminish. Further, Commissioner Watson predicted that if Reid is allowed to manipulate resources by refusing medical care, his "condition will create a perception that the administration is not in control of the inmate population."

No testimony was presented, however, as to why the concerns expressed by the Commissioner and Assistant Commissioner would be any different if Reid were compelled to submit to weekly dialysis treatment. Thus, in our view, if the court is to defer to the expert judgment of correction officials, that judgment must be reasonable and informed. *See Turner,* 482 U.S. at 93, 107 S.Ct. at 2264, 96 L.Ed.2d at 82 (holding

that the standard is whether the actions of prison officials were "reasonably related to valid corrections goals" and not "an exaggerated response to those objectives"); *Jones*, 433 U.S. at 128, 97 S.Ct. at 2539, 53 L.Ed.2d at 640 (holding that regulations prohibiting inmates from soliciting other inmates to join a prisoner's union were reasonable and consistent with legitimate operational considerations of the prison). In this case, the evidence presented was merely speculative, which is insufficient under *Turner* to present a "valid, rational connection" between the infringement on Reid's right to refuse medical treatment and the legitimate governmental interests asserted. Here, the trial judge noted that consideration of the impact on institutional operations was an appropriate penological objective of the corrections system; however, the evidence presented at the hearing did not persuade the court that the correction officials' conclusions were reasonable and supported by the evidence. In effect, the trial court determined that, based upon the evidence presented, or lack thereof, the correctional officials exaggerated their response to Reid's refusal to submit to dialysis treatment.

### Maintaining the Integrity of the Medical Profession

The Commissioner cites *Polk* as authority to support his claim that the ethical integrity of the medical profession has been impaired by Reid's refusal to submit to kidney dialysis. *See Polk*, 594 N.W.2d at 428 (holding that the ethical integrity of the medical profession was impaired by permitting the inmate, Brown, to refuse kidney dialysis). In addition, the Commissioner contends that "Reid's ill-informed refusal to accept standard medical treatment for a set of non-terminal conditions impairs the ethical integrity of his physicians." The Court of Special Appeals stated that it failed to see how the medical profession has been harmed by Reid's refusal to accept treatment, and likewise, so do we.

The intermediate appellate court reasoned:

[T]he circuit court found that [Reid] is a competent adult who has expressly stated his desire to forego medical treatment he finds objectionable. [The Commissioner] has ne-

glected to illuminate any ethical dilemma on which to base his argument. Medical professions continue to provide ... diagnoses and continue to attempt to treat patients with no question as to their ethics or integrity. Furthermore, in light of the well-defined right of an individual to refuse medical treatment, discussed *supra*, and having been provided no authority by [the Commissioner] to indicate otherwise, we hold that the ethical integrity of the medical profession is not harmed by allowing [Reid], a competent adult, to refuse medical treatment.

*Stouffer,* 184 Md.App. at 285, 965 A.2d at 106.

The Iowa Supreme Court in *Polk* determined that "preserving the ethical integrity of [the medical professional's] recommendation [of treatment] also favors [the] decision to compel treatment" because if Brown would voluntarily submit to dialysis treatment, his submission would be consistent with the medical professionals' recommendation in helping to prolong Brown's life. *Polk,* 594 N.W.2d at 428. In our review of that opinion, we are not persuaded that Brown's refusal to submit to kidney dialysis had any effect on the integrity of the medical profession.

In the present case, merely because health care professionals recommended kidney dialysis or other treatment for Reid, and he rejected that recommendation, his rejection did not harm the integrity of the medical professional. An inmate, by virtue of his incarceration, is not divested of his right to disagree with his medical providers. Although Reid has both a common law and constitutional right to refuse unwanted medical treatment, *Mack,* 329 Md. at 210–11, 618 A.2d at 755; *see also Cruzan,* 497 U.S. at 277, 110 S.Ct. at 2851, 111 L.Ed.2d at 241, in the present case we base our decision on Reid's common law right to refuse medical treatment and therefore need not reach the constitutional question. As noted by courts in other jurisdictions, a patient's right of self-determination, ordinarily, is superior to the considerations of the medical profession as to treatment options. *See Thor,* 21 Cal.Rptr.2d 357, 855 P.2d at 386 (noting that "patient autonomy and medical ethics are not reciprocals; one does not come

at the expense of the other"); *Myers,* 399 N.E.2d at 458 (noting that the interest in maintaining the integrity of the medical profession is not controlling because a "patient's right of self-determination would normally be superior to . . . institutional concerns" of the government and medical profession).

The Commissioner also asserts that the trial court's written finding that Reid's refusal of treatment did not affect the integrity of the medical profession contradicts the court's oral findings and is clearly erroneous. Based upon our review of the record, we fail to see any contradiction in the written findings of the trial judge and his oral pronouncements. In addition, the court's written findings of fact are not clearly erroneous. The court acknowledged that Reid rejected the advice and efforts of his physicians, and that the physicians believed that Reid's treatment was necessary. Ultimately, the trial judge concluded that Reid's refusal of treatment did not affect the integrity of the medical profession. In the present case, there was appropriate consultation by medical providers with Reid concerning his treatment. After consultation, Reid rejected the recommendations of his physicians. On the basis of this record there is no violation of the integrity of the medical profession. Moreover, the record supports the trial judge's factual findings.

### Interests of Third Parties and Prevention of Suicide

The Commissioner advances no contention that the "interests of innocent third parties" or "the prevention of suicide" are implicated in this case. Although the Commissioner contends that we should follow the case of *Polk,* we suggest that *Polk* is further distinguishable from the present case on another basis. In concluding that the State of Iowa had a compelling interest in preserving Brown's life, the court in *Polk* factored into its analysis the "emotional impact upon" Brown's minor children and that Brown might someday be "in a position to provide financial support for them." *Polk,* 594 N.W.2d at 428. Here, as the Court of Special Appeals pointed out, "[t]here is nothing in [Reid's] condition that endangers or affects the public health." In addition, as the intermediate

appellate court noted, Reid has no "children or dependents that would be affected by any choice [he] makes concerning his health." *Stouffer*, 184 Md.App. at 284, 965 A.2d at 105.

Considering the specific circumstances of this case and Reid's right to refuse medical treatment, absent evidence that Reid is a direct threat to the safety and well being of others or that he is protesting any prison policies or attempting to manipulate an official, we agree with the Court of Special Appeals that the State has not shown a valid penological interest in compelling Reid to submit to dialysis.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**